XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
TIMOTHY R. PATTERSON (SBN 72209)
MICHAEL P. CAYABAN (SBN 179252)
Supervising Deputy Attorneys General
JOHN APPELBAUM (SBN 149643)
NOAH GOLDEN-KRASNER (SBN 217556)
JANELLE M. SMITH (SBN 231801)
AMIE MEDLEY (SBN 266586)
DAVID P. ALDERSON (SBN 231597)
BAINE P. KERR (SBN 265894)
Deputy Attorneys General
 600 West Broadway, Suite 1800
 San Diego, California 92101
 Telephone: (619) 738-9313
 Fax: (619) 645-2271
 E-mail: Mike.Cayaban@doj.ca.gov
*Attorneys for the People of the State of
California, by and through Xavier Becerra,
Attorney General, and the California Coastal
Commission*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA, BY AND THROUGH XAVIER BECERRA, ATTORNEY GENERAL; THE CALIFORNIA COASTAL COMMISSION,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ACTING SECRETARY ELAINE DUKE, IN HER OFFICIAL CAPACITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND ACTING COMMISSIONER KEVIN K. McALEENAN, IN HIS OFFICIAL CAPACITY,**<br><br>Defendants. | Case No. **'17 CV 1911 W    BLM**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

Plaintiffs, the People of the State of California, by and through Attorney General Xavier Becerra ("People"), and the California Coastal Commission ("Commission") (collectively referred to as "Plaintiffs"), allege as follows:

**INTRODUCTION**

1.    The People bring this action to protect the State of California's residents, natural resources, economic interests, procedural rights, and sovereignty from violations of the United States Constitution, the National Environmental Policy Act and the Administrative Procedure Act occurring as a result of the actions of the United States of America, the United States Department of Homeland Security ("DHS"), former DHS Secretary John Kelly in his official capacity, Acting DHS Secretary Elaine Duke in her official capacity, the United States Customs and Border Protection ("CBP"), and Acting CBP Commissioner Kevin K. McAleenan in his official capacity (together "Defendants"), with respect to the planning and construction of a border wall and related border barrier projects along the southern border of the United States, including significant projects in California ("Border Wall" or "Border Wall Projects").  The Commission brings this action to protect natural resources within California's coastal zone, land and water uses within the coastal zone, and the Commission's procedural rights from violations of the Coastal Zone Management Act and other statutes resulting from Defendants' actions relating to the Border Wall.

2.    As a presidential candidate, and subsequently as President, President Trump repeatedly has stated his intent to build a wall across the entire United States border with Mexico.  On January 25, 2017, he issued Executive Order No. 13767 concerning "Border Security and Immigration Enforcement Improvements" ("Executive Order").  The Executive Order directs the Secretary of DHS to identify and "allocate all sources of Federal funds for the planning, designing and construction of a physical wall along the southern border."

Complaint for Declaratory and Injunctive Relief

3.     The Executive Order cites the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") (Pub. L. 104–208; 8 U.S.C. § 1103 note) as authority for the construction of the Border Wall.  As amended by the Real ID Act of 2005 (Pub. L. 109–13), the Secure Fence Act of 2006 (Pub. L. 109–367), and the Department of Homeland Security Appropriations Act, 2008 (Pub. L. 110-161), Section 102 of IIRIRA authorizes the Secretary of DHS to install "additional" physical barriers along the United States border to deter illegal crossings in "areas of high illegal entry" into the United States "along not less than 700 miles of the southwest border."  8 U.S.C. section 1103 note.  IIRIRA also required the Secretary to identify 370 miles of "priority areas" and it imposed a deadline to construct reinforced fencing in those areas by no later than December 31, 2008.  8 U.S.C. section 1103 note.

4.     Since 2006, under the Congressional authority granted to it, DHS installed hundreds of miles of reinforced fencing along the US-Mexico border. There are currently 702 miles of primary, secondary and tertiary fencing along approximately 654 miles of the border.  This includes primary pedestrian and/or vehicle barriers along most of the 140.4-mile-long border within California, and multiple layers of reinforced fencing along a 14-mile segment of the western end of the border in San Diego County.  The Secretary of DHS also identified "priority areas" for expedited construction pursuant to the requirements of the provision.  In April 2008, the Secretary last exercised his authority to waive federal laws.  DHS completed all of the "priority areas" projects authorized by Congress under Section 102.  By doing so, the DHS completed its task as envisioned and authorized in Section 102 of IIRIRA.  8 U.S.C. § 1103 note, subdivision (b)(1).

5.     In 2017, DHS announced that initial construction of Border Wall projects will occur in Naco, Arizona; Sunland Park, New Mexico; San Diego County, California; Imperial County, California; El Paso, Texas; and, the Rio Grande Valley, Texas.  With respect to San Diego County, DHS announced that, pursuant

3

to the Executive Order, it intends to replace 14 miles of existing primary fencing with new fencing and to replace 14 miles of existing secondary fencing with a solid wall or other barrier. DHS has also solicited and received design bids from contractors seeking to design and build the Border Wall, and has announced that selected contractors will build prototypes of their Border Wall designs in San Diego County, as part of the bidding process.

6.    Section 102 of IIRIRA contains a provision that allows the Secretary of DHS to waive any law he or she deems necessary to expeditiously construct reinforced fencing authorized under that section. 8 U.S.C. § 1103 note, subdivision (c). On August 2, 2017, former Secretary John Kelly attempted to exercise this waiver authority by publishing a Notice of Determination in the Federal Register. Determination pursuant to Section 102 of [IIRIRA], as Amended, 82 Fed. Reg. 35 984 (August 2, 2017) ("San Diego Waiver"). The San Diego Waiver states "DHS will immediately implement various border infrastructure projects" within the "Project Area." *Id.* The Project Area is described as a fifteen-mile segment of the border within the United States Border Patrol's San Diego Sector beginning at the Pacific Ocean and extending eastward. The only infrastructure projects specifically identified in the San Diego Waiver are the replacement of 14 miles of existing primary fencing and the construction of prototype border walls (hereinafter "San Diego Project"). *Id.* The San Diego Waiver purports to waive more than 30 federal laws, as well as all state and local laws derived or related thereto, to expedite the construction of all of the "various border infrastructure projects" that DHS intends to build within the Project Area.

7.    On September 12, 2017, Acting DHS Secretary Elaine Duke attempted to exercise Section 102's waiver provision with respect to the proposed replacement of fencing in another area of California by publishing a Notice of Determination in the Federal Register. Determination Pursuant to Section 102 of IIRIRA, as Amended, 82 Fed. Reg. 42829 (September 12, 2017) ("Calexico Waiver"). The

4

Calexico Waiver states that "DHS will take immediate action to replace existing primary fencing" along a segment of the border that starts near the Calexico West Land Port of Entry and extends three miles to the west. ("Calexico Project"). The Calexico Waiver purports to waive 27 federal laws, as well as all state and local laws derived from or related thereto, to expedite the fence replacement project.

8.    In this action for declaratory and injunctive relief, Plaintiffs challenge Defendants' failure to comply with the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 et. seq. (1970) *as amended* ("NEPA") the Administrative Procedure Act, 5 U.S.C. § 551 et. seq. (1946) *as amended* ("APA"), and the Coastal Zone Management Act, 16 U.S.C. § 1451 et. seq. (1972) *as amended* ("CZMA").  The Plaintiffs request the Court enjoin DHS from engaging in any and all planning, design and construction activities related to installing barriers along the United States-Mexico border, including the construction of prototypes, and all other infrastructure plans referenced in the San Diego and Calexico Waivers, until DHS fully complies with these laws.

9.    Plaintiffs also seek a judicial declaration by this Court that Section 102 of IIRIRA, the provision cited in the Executive Order, does not apply to DHS's proposed construction of a Border Wall, which includes but is not limited to the construction of prototype walls and fences, the construction of barriers and roads that are not in areas of high illegal entry, the construction of barriers that are not in areas where the fencing would be most practical and effective, and the replacement of existing walls and fencing along the United States-Mexico border.

10.    Plaintiffs also seek a judicial declaration by this Court that the San Diego and Calexico Waivers fail to meet the requirements of Section 102 of IIRIRA, that former Secretary DHS Kelly and Acting DHS Secretary Duke acted outside of their statutory authority in issuing the waivers, and that both waivers are invalid and ineffective.  The waivers are invalid because the described projects do not involve the installation of "additional" fencing or the construction of barriers in areas of

5

high illegal entry, and are not located where additional fencing would be most practical and effective.  The San Diego and Calexico waivers are also invalid because Defendants are attempting to rely on a provision relating to expeditious construction 10 years after the statute was last amended and nine years after the authority to waive laws for expedited construction in priority areas expired.

11.    Additionally, Plaintiffs seek an order declaring the San Diego and Calexico Waivers are improper and unconstitutional in that they attempt to waive laws to expedite the construction of undisclosed projects, denying Plaintiffs and other parties a reasonable opportunity to determine if the undisclosed projects are authorized by Section 102 and how the undisclosed projects might impact their interests.

12.    Finally, Plaintiffs seek an order declaring Section 102 to be unconstitutional on both its face and as applied, and invalidating Section 102, the portion of the Executive Order that authorizes the use of Section 102 to build the Border Wall and the San Diego and Calexico Projects, and the San Diego and Calexico Waivers.

**JURISDICTION AND VENUE**

13.    This Court has jurisdiction because this action arises under the United States Constitution pursuant to Article I, Article III, and the Fifth and Tenth Amendments of the United States Constitution, and also pursuant to 28 U.S.C. §§ 1331 and 1346, and 5 U.S.C. §§ 701 to 706.

14.    An actual, present and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 1651, 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

15.    The People have been granted a right to sue under the APA and NEPA because they fall within the APA's broad definition of a "person . . . adversely affected or aggrieved by agency action. . . ." 5 U.S.C. § 702; see also 5 U.S.C. §

6

551(2).  The People and the Commission have also been granted the right to sue for violations of the CZMA.  5 U.S.C. § 702; see also, *State of California v. Norton,* 311 F.3d 1162, 1170 (9th Cir. 2002).

16.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because all parties have offices within this district and therefore reside in this district, because a substantial part of the events or omissions giving rise to the claims occurred in this district, and/or a substantial part of the property that is the subject of the action is situated in this district. Moreover, other cases that relate to Defendants' Border Wall projects have been filed in this judicial district.

## PARTIES

17.  The People of the State of California, as plaintiff, bring this action by and through Xavier Becerra, Attorney General of the State of California.  Attorney General Becerra is the chief law officer of the State of California and has the authority to file civil actions in order to protect the People's rights and interests, the environment, and the natural resources of this State.  Cal. Const., art V, § 13, Cal. Gov. Code §§ 12600-12612, 12511-12512. This challenge is brought pursuant to the Attorney General's independent constitutional, common law, and statutory authority.  In this case, the interest the Attorney General seeks to advance and protect is not limited to a *parens patriae* interest in the general welfare of California's citizens, but rather encompasses California's procedural interests, interests in the specific natural resources of this State - such as wildlife, fish, and water - that are held in trust by the State for the People, economic interests in maintaining tourism and trade with Mexico, economic interests relating to the management of real property adjacent to the border, and sovereign interests in enacting and enforcing its own laws.

18.  The Commission is a state agency designated as the agency responsible for implementing the CZMA within California's coastal zone and developing state programs designed to meet the goals of the CZMA. *American Petroleum Institute*

7

*v. Knecht,* 609 F.2d 1306 (9th Cir. 1979); Cal. Pub. Res. Code §§ 30008, 30330. The Commission has jurisdictional and procedural interests in ensuring that activities within or affecting California's coastal zone will not negatively affect any land or water uses within the coastal zone or negatively affect any natural resources within the coastal zone.

19.   Defendant United States of America is responsible for enacting and enforcing laws that are consistent with the Constitution of the United States.

20.   Defendant Department of Homeland Security ("DHS") is the federal agency responsible for providing border security along the U.S.-Mexico border in a manner that is consistent with the laws and Constitution of the United States.

21.   Defendant Elaine Duke, the Acting Secretary of DHS, is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in her official capacity.

22.   Defendant U.S. Customs and Border Protection ("CBP") is a federal agency within DHS responsible for implementing the actions and decisions being challenged by Plaintiffs in this action.

23.   Defendant Kevin K. McAleenan, the Acting Commissioner of CBP, is responsible for implementing the actions and decisions being challenged by Plaintiffs in this action and is sued in his official capacity.

## SUMMARY OF THE LAW

### I.   NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")

24.   NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500. l (a).  It was enacted with the ambitious objectives of "encouraging productive and enjoyable harmony between man and his environment . . . promoting efforts which will prevent or eliminate damage to the environment and biosphere and stimulating the health and welfare of man; and enriching the understanding of the ecological systems and natural resources important to the Nation. . ." 42 U.S.C. 4321.

8

25.   In order to achieve these goals, NEPA contains several "action forcing" procedures, most significantly the mandate to prepare an environmental impact statement ("EIS") on major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332 (2)(C).

26.   The Supreme Court has found that the preparation of an EIS promotes NEPA's broad environmental objectives in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

27.   NEPA mandates disclosure and consideration of direct, indirect, and cumulative environmental effects.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8, l508.27(b)(7).

28.   Direct effects are caused by the action and occur at the same time and place as the proposed project.  40 C.F.R. § 1508.8(a).  Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  40 C.F.R. § l 508.8(b).  These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health whether direct, indirect, or cumulative."  40 C.F.R. § 1508.8.

29.   In determining whether a federal action significantly affects the quality of the human environment, federal agencies must consider several factors relating to the "intensity" of the project, including: the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands . . . wetlands, wild and scenic rivers, or ecologically critical areas" (40 C.F.R. § 1508.27(3)); "[t]he degree to which the effects on the quality of the human

9

environment are likely to be highly controversial" (40 C.F.R. § 1508.27(4));

"[w]hether the action is related to other actions with individually insignificant but

cumulatively significant impacts" (40 C.F.R. § 1508.27(7)); "[t]he degree to which

the action may adversely affect an endangered or threatened species or its habitat

that has been determined to be critical under the Endangered Species Act of 1973"

(40 C.F.R. § 1508.27(9)); and, "[w]hether the action threatens a violation of

Federal, State, or local law or requirements imposed for the protection of the

environment." 40 C.F.R. § 1508.27(10).

30.   A proposal subject to NEPA exists where an agency has a goal and is

actively preparing to make a decision on the alternatives in accomplishing that goal,

regardless of whether the agency declares that such a proposal exists: "An agency

shall commence preparation of an environmental impact statement as close as

possible to the time the agency is developing or is presented with a proposal."  40

C.F.R. § 1502.5.  A "Proposal exists at that stage in the development of an action

when an agency subject to the Act has a goal and is actively preparing to make a

decision on one or more alternative means of accomplishing that goal and the

effects can be meaningfully evaluated."  40 C.F.R. § 1508.23.

31.   An EIS must include a statement of purpose and need to which the

agency is responding, an analysis of a reasonable range of alternatives and a

comparison of their environmental impacts, an analysis of affected areas and

resources, and an assessment of the environmental consequences of the proposed

action and alternatives (including direct, indirect and cumulative effects on the

environment.)  40 C.F.R. §§ 1502.10-1502.19.

32.   An EIS is prepared in two stages.  A draft EIS must be prepared first and

then published in order to obtain comments from the public and from governmental

agencies.  Following a period of public comment, the federal agency must then

prepare a final EIS that responds to all comments received on the draft EIS.  40

C.F.R. § 1503.

33.   "The purpose of an EIS is to apprise decision makers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain [ ] a maximum range of options.'"  *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988.)  Thus, "NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process.  *State of California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) [citation omitted].  "The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision making process and will not be used to rationalize or justify decisions already made."  40 C.F.R. § 1502.5.

34.   The People have a concrete and particularized interest in protecting "the State of California's territory and its proprietary interests both from direct harm and from spill-over effects resulting from action on federal land."  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011.)  The construction of a Border Wall, prototypes for a Border Wall, and /or replacement fencing of a different type than the current fencing would have such direct and spill-over effects.

## II.   ADMINISTRATIVE PROCEDURE ACT ("APA")

35.   The APA provides for judicial review of "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.  Agency action is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

36.   In reviewing a challenge to an agency's failure to act, the APA directs that the court "shall compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

Complaint for Declaratory and Injunctive Relief

### III.  THE COASTAL ZONE MANAGEMENT ACT ("CZMA")

37.  The Coastal Zone Management Act ("CZMA") is a federal law intended to "preserve, protect, develop and where possible, to restore and enhance the resources of the nation's coastal zone." 16 U.S.C. § 1452.

38.  The CZMA authorizes states to designate a "State Agency" responsible for implementing the CZMA within that particular state's coastal zone and to develop state programs designed to meet the goals of the CZMA.  The California Coastal Act designates the California Coastal Commission ("Commission") as the "state agency" responsible for implementing the CZMA over California's ocean coastline.  Cal. Pub. Resources Code §§ 30300 et seq.

39.  The Commission developed the California Coastal Management Program ("CCMP") in order to achieve that goal.  16 U.S.C. § 1454(c); Cal. Pub. Resources Code § 30330.  The federal government approved the CCMP in 1977 as compliant with the requirements of the CZMA.

40.  Federal approval of the CCMP triggered the consistency requirements of the CZMA.  When a federal agency undertakes an activity, occurring inside or outside the coastal zone, that affects directly or indirectly any land or water uses or natural resources of the California coastal zone, the CZMA requires that the agency must provide a "consistency determination" to the Commission.  16 U.S.C. § 1456(c)(1)(A).  The consistency determination must include a statement indicating that the federal action will be undertaken in a manner that is consistent to the maximum extent practicable with the CCMP.  16 U.S.C. § 1456(C)(2); 15 C.F.R. 930.32, 930.39.  Alternatively, the federal agency may prepare a negative determination if the agency determines that the project will not affect any coastal use or resource.

41.  The federal agency proposing a development project is required to provide the Commission with a "consistency determination" or "negative determination" "at the earliest practicable time in the planning" of the development

project.  15 C.F.R. § 930.36.  "A consistency determination should be prepared following the development of sufficient information to reasonably determine the consistency of the activity with the management program, but before the Federal agency reaches a significant point of decision making in its review process, i.e., while the Federal agency has the ability to modify the activity."  15 C.F.R. § 930.36(b).

42.   The Commission is entitled to review the federal agency's consistency determination and may file objections to the determination and/or seek additional information from the agency regarding its determination.  15 C.F.R. §§ 930.39 - 930.42.  The Commission is further entitled to request mediation by the Secretary of Commerce if the dispute cannot be resolved and/or seek judicial review.  15 C.F.R. § 930.116.  If a federal agency decides to carry out an activity despite a Commission objection, the Commission is entitled to seek judicial review pursuant to the APA.  *State of California v. Norton,* 311 F.3d 1162, 1170 (9th Cir. 2002).

## IV.   SECTION 102 OF IIRIRA

43.   Section 4 of the Executive Order relies upon Section 102 of IIRIRA as the legal basis for replacing border fences.  82 Fed. Reg. 8793.

44.   Before 1996, there was no express statutory authority that permitted or required construction of barriers along U.S. borders.  That changed when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Pub. L. 104-208).  Section 102 of IIRIRA authorized the U.S. Attorney General, in consultation with the Commissioner of Immigration and Naturalization, to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  *Id.* § 102(a).  Section 102 also required construction of second and third fences parallel to a 14-mile segment of primary fencing installed a few years earlier along the border near San Diego.  The 14-mile segment starts at the Pacific Ocean and extends 14 miles east.  *Id.* § 102(b).

1    Further, Section 102 contained a provision that permitted the Attorney General to

2    waive application of the ESA and NEPA "to the extent the Attorney General

3    determines necessary to ensure expeditious construction of the barriers and roads

4    under this section." *Id.* § 102(c).

5        45.   The Real ID Act of 2005 (Pub. L. 109-113 Div. B) amended Section 102

6    of IIRIRA by transferring the waiver authority from the Attorney General to the

7    Secretary of Homeland Security, and expanding the waiver authority to include "all

8    legal requirements such Secretary, in such Secretary's sole discretion, determines

9    necessary to ensure expeditious construction of the barriers and roads under this

10   section."  Section 102 did not specify the laws that Congress authorized the

11   Secretary to waive.  It also limited legal challenges to any waiver decision to

12   constitutional claims, and eliminated appellate court review.

13       46.   The Secure Fence Act of 2006 (Pub. L. 109-367) amended Section 102 of

14   IIRIRA again by removing the provisions referring specifically to the 14-miles of

15   fencing in San Diego, and instead directing DHS to construct two layers of

16   reinforced fencing along five separate segments of the border, totaling more than

17   800 miles.

18       47.   The Department of Homeland Security Appropriations Act, 2008 (Pub.

19   L. 110-161) ("2008 Amendment") amended Section 102 a third and final time by

20   removing requirements for doubled-layered fencing in specific locations, and by

21   directing the Secretary of Homeland Security to construct reinforced fencing along

22   not less than 700 miles of the border where it would be most practical and effective.

23   The 2008 Amendment also amended the statute by striking the phrase "Security

24   Features" from the heading for subdivision (b)(1) and replacing it with the phrase

25   "Additional Fencing Along Southwest Border."

26       48.   The 2008 Amendment also amended the statute by compelling the

27   Secretary of Homeland Security to designate "Priority Areas" for 370 miles of

28   additional fencing, and by compelling the Secretary to expedite the construction of

14

said fencing in these "priority areas," requiring the completion of construction by not later than December 31, 2008.  (Pub. L. 110-161.).  Thus, Congress imposed a December 31, 2008 deadline for the expedited construction of additional barriers and roads in priority areas under Section 102.

49.   There have been no amendments to Section 102 of IIRIRA since the 2008 Amendment was signed into law.

Subsections (a) and (b) of Section 102 currently state that:

(a)    In General.  — The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b)  Construction of Fencing and Road Improvements Along the Border.—

(1)    Additional fencing along southwest border.—

(A)    Reinforced fencing.— In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

(B)    Priority areas. — In carrying out this section, the Secretary of Homeland Security shall —

(i)    identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

(ii)    not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

50.   Subsection (c) of Section 102 further states "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads

Complaint for Declaratory and Injunctive Relief

under this section." The section is limited to the installation of "additional barriers and roads . . . in areas of high illegal entry." Section 102(a).

51. Section 102 of IIRIRA does not authorize the replacement of existing barriers or roads along the southwest border.

52. Section 102 of IIRIRA does not authorize the construction of temporary prototype walls along the southwest border.

53. Section 102 of IIRIRA does not authorize the construction of barriers and roads along the southwest border other than in "areas of high illegal entry into the United States" and in areas where the barriers would be most practical and effective.

54. Section 102 of IIRIRA imposed a deadline on the Secretary's authority to identify and construct reinforced fencing in "priority areas" by no later than December 31, 2008.

## FACTUAL ALLEGATIONS

### I. EXISTING INFRASTRUCTURE ALONG THE U.S.-MEXICO BORDER

55. Between 1990 and 1993, the United States constructed 10-foot-high solid steel fencing along a 14-mile segment of the border in San Diego County, with its western end beginning at the Pacific Ocean. This section of fencing, which was placed directly on the U.S.-Mexico border, is referred to as the San Diego primary fence.

56. In 1994, USBP enacted a program known as "Operation Gatekeeper," which included a large increase in the number of border patrol agents and other resources deployed to the San Diego Sector. Over a four-year period, the number of agents assigned to the San Diego sector increased by 150% and the number of seismic sensors increased by 171%.

57. In 1996, former INS began construction of a multi-tiered fencing project in the western-most portion of the San Diego sector. The project, which was initially referred to as the Triple-Fence Project and later known as the 14-Mile

Border Infrastructure Project ("14-Mile BIS"), called for the construction of new secondary and tertiary fencing that would parallel the existing, San Diego primary fence.

58.    The entire 14-Mile BIS fell within the watershed of the Tijuana River, a river that culminates in the United States where the Tijuana River estuary meets the Pacific Ocean.  The western-most 4.5 miles of the 14-Mile BIS abuts the Tijuana River National Estuarine Research Reserve ("Tijuana Reserve"), the County of San Diego's Tijuana Valley Regional Park, and the State of California's Border Field State Park.  The United States Fish and Wildlife Service and other federal, state and local governmental entities reported that the 14-Mile BIS would result in the taking of several endangered plant and animal species, the destruction of critical habitat and the degradation of impaired bodies of water.

59.    In September 2005, former DHS Secretary Michael Chertoff executed a waiver, pursuant to subsection (c) of Section 102 of IIRIRA, seeking to waive all federal and state "legal requirements deriving from or related to the subject of" several laws, including NEPA, the Endangered Species Act, the APA, the CZMA, and the Clean Water Act.  The waiver referred specifically to the expedited construction of a "second and third fence" extending eastward from the Pacific Ocean as set forth in the original version of IIRIRA.  70 Fed. Reg. 55622.

60.    The 14-Mile BIS Project was completed in 2009, approximately, consisting of secondary fencing that parallels the pre-existing primary fencing installed in the early 1990s.  The 14-Mile Border Infrastructure Project also includes tertiary fencing to the north of the secondary fence in selected locations. Currently, as a result of the 14-Mile BIS, there are at least two fences along a 14-mile segment of the border beginning at the Pacific Ocean and extending eastward. In 2009, the Government Accountability Office projected that the cost of the final 4.5 miles of the project was $96 million, roughly $21 million per mile.

61.   Construction of the 14-Mile BIS resulted in the destruction of sensitive upland and wetland habitats, the taking of endangered plant and animal species, the spread of invasive plant species, and the increase in sedimentation within Border Field State Park and the Tijuana Reserve.  These areas have also been designated as Federally critical and/or sensitive habitats.

62.   DHS relied on Section 102's waiver provision to expedite the construction of additional primary pedestrian fencing and primary vehicle fencing in other parts of California, as well as in Arizona, New Mexico and Texas.

63.   The Secretary of DHS invoked the waiver authority conferred in Section 102 five times during the period of September 2005 through April 2008, in relatively close succession following amendments to Section 102 of IIRIRA during that same time period.  70 Fed. Reg. 55622; 72 Fed. Reg. 2535; 72 Fed. Reg. 60870; 73 Fed. Reg. 19077; 73 Fed. Reg. 19078.

64.   Each waiver related to particular border infrastructure projects at specific areas along the border and was used to expedite the construction of additional fencing or roads that did not previously exist; none was used to authorize the expedited replacement of pre-existing barriers.  70 Fed. Reg. 55622; 72 Fed. Reg. 2535; 72 Fed. Reg. 60870; 73 Fed. Reg. 19077; 73 Fed. Reg. 19078.

65.   Former DHS Secretary Chertoff waived 36 federal laws as well as state laws and regulations derived from or relating to several federal statutes.  These laws included NEPA, ESA, Coastal Zone Management Act, Resource Conservation and Recovery Act and the Clean Water Act.  70 Fed. Reg. 55622; 72 Fed. Reg. 2535; 72 Fed. Reg. 60870; 73 Fed. Reg. 19077; 73 Fed. Reg. 19078.  Two of the waivers were used to waive laws enacted by the State of California.  70 Fed. Reg. 55622; 73 Fed. Reg. 19078.

66.   In 2008, before the December 31, 2008 deadline established by the 2008 Amendment, former Secretary Chertoff identified more than 370 miles of priority areas for expedited construction and committed DHS to completing a total of 661

miles of border fencing by the first half of 2009.  Former Secretary Chertoff issued waivers April 2008 to complete this construction.  73 Fed. Reg. 19077; 73 Fed. Reg. 19078.

67.   Currently, there are 702 miles of fencing along 654 miles of the U.S.-Mexico border.  This includes CBP's installation of 37 miles of secondary fencing and 14 miles of tertiary fencing, completing the goal of 700 miles as contemplated in IIRIRA.

**II.    THE EXECUTIVE ORDER AND DESCRIPTIONS OF THE BORDER WALL PROJECT INCLUDING THE CONSTRUCTION OF PROTOTYPES, THE REPLACEMENT OF EXISTING FENCES AND THE CONSTRUCTION OF ADDITIONAL BARRIERS IN SELECTED LOCATIONS**

68.   On January 25, 2017, President Trump issued Executive Order No. 13767 authorizing the Secretary of Homeland Security to "take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border, using appropriate materials and technology to most effectively achieve complete operational control of the southern border."  The Executive Order defines the term "wall" as "a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier."  The Executive Order does not distinguish between "areas of high illegal entry" and other areas of the southwest border, nor does it direct the Secretary of Homeland Security to identify "priority areas" for construction. 82 Fed. Reg. 8793.  The Executive Order cites the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) and Section 102 of IIRIRA as authority for the project.  82 Fed. Reg. 8793.

69.   In March 2017, DHS solicited design proposals for two different types of barriers, one a reinforced concrete wall and the other an unspecified barrier.  DHS announced that it selected contractors to construct prototypes of their designs in the Otay Mesa area of San Diego County, in an area approximately 120 feet from the U.S. border.  Construction of these prototypes is scheduled to commence in the fall of 2017.

70.   On May 2, 2017, at a joint White House press briefing featuring former Secretary Kelly and Office of Management and Budget Director Mick Mulvaney, Mr. Mulvaney stated that DHS is complying with the Executive Order and fulfilling President Trump's promise to build a Border Wall by replacing existing border fence in selected locations with a "steel wall."  He acknowledged that these replacement activities did not constitute the installation of "new" barriers.

71.   DHS has already determined the location of portions of the proposed Border Wall project.  On May 3, 2017, former White House Press Secretary Sean Spicer stated that as part of President Trump's commitment to "building a wall," the administration is currently engaged in projects to replace existing fencing with new "bollard walls" in Naco, Arizona and Sunland Park, New Mexico.  Mr. Spicer further stated that the administration would begin its replacement of existing fences in "San Diego, El Paso and Rio Grande Valley."

72.   On June 13, 2017, Border Patrol chief Carla Provost testified at a Congressional hearing that four to eight prototypes will be built in the San Diego and Rio Grande Valley areas beginning in late summer 2017.  Ms. Provost also confirmed that forty miles of fencing will be replaced in San Diego, El Paso, and El Centro.

73.   In addition to these publicized aspects of the Border Wall project, Plaintiffs are informed and believe that DHS is currently engaged in the grading of and widening of dirt roads in areas along the border, including areas containing sensitive biological resources in east San Diego County, as part of the Border Wall project.  DHS is engaged in this activity despite the fact that DHS failed to comply with the requirements of NEPA.

## III.   THE SAN DIEGO AND CALEXICO WAIVERS

74.   The San Diego Waiver was published in the Federal Register on August 2, 2017.  82 Fed. Reg. 35,984.  The summary of the San Diego Waiver states that "[t]he Secretary of Homeland Security has determined, pursuant to law, that it is

1  necessary to waive certain laws, regulations and other legal requirements in order to

2  ensure the expeditious construction of barriers and roads in the vicinity of the

3  international land border of the United States near the city of San Diego in the state

4  of California." *Id.*

5     75.   The San Diego Waiver further states the Secretary's finding that the area

6  "[s]tarting at the Pacific Ocean and extending to approximately one mile east of

7  Border Monument 251" is "an area of high illegal entry," that "[t]here is presently a

8  need to construct physical barriers and roads, including the infrastructure projects"

9  described earlier in the waiver, and that he has determined it necessary to "exercise

10  the authority that is vested in me by Section 102(c) of IIRIRA as amended." *Id.*

11     76.   The San Diego Waiver purports to waive "in their entirety, with respect

12  to the construction of roads and physical barriers . . . in the Project Area, the

13  following statutes, including all federal, state, or other laws, regulations and legal

14  requirements of, deriving from, or related to the subject of, the following statutes,

15  as amended: The National Environmental Policy Act (Pub. L. 91–190, 83 Stat. 852

16  (Jan. 1, 1970) (42 U.S.C. 4321 et eq.)), the Endangered Species Act (Pub. L. 93–

17  205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 et seq.)), the Federal Water

18  Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C.

19  1251 et seq.)), the National Historic Preservation Act (Pub. L. 89–665, 80 Stat. 915

20  (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113–287 (Dec. 19,

21  2014) (formerly codified at 16 U.S.C. 470 et seq., now codified at 54 U.S.C.

22  100101 note and 54 U.S.C. 300101 et seq.)), the Migratory Bird Treaty Act (16

23  U.S.C. 703 et seq.), the Migratory Bird Conservation Act (16 U.S.C. 715 et seq.),

24  the Clean Air Act (42 U.S.C. 7401 et seq.), the Archeological Resources Protection

25  Act (Pub. L. 96–95 (16 U.S.C. 470aa et seq.)), the Paleontological Resources

26  Preservation Act (16 U.S.C. 470aaa et seq.), the Federal Cave Resources Protection

27  Act of 1988 (16 U.S.C. 4301 et seq.), the National Trails System Act (16 U.S.C.

28  1241 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), the Noise

Control Act (42 U.S.C. 4901 et seq.), the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.), the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 et seq.), the Archaeological and Historic Preservation Act (Pub. L. 86–523, as amended, repealed, or replaced by Pub. L. 113–287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 469 et seq., now codified at 54 U.S.C. 312502 et seq.)), the Antiquities Act (formerly codified at 16 U.S.C. 431 et seq., now codified 54 U.S.C. 320301 et seq.), the Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C. 461 et seq., now codified at 54 U.S.C. 3201–320303 & 320101–320106), the Wild and Scenic Rivers Act (Pub. L. 90–542 (16 U.S.C. 1281 et seq.)), the Farmland Protection Policy Act (7 U.S.C. 4201 et seq.), the Coastal Zone Management Act (Pub. L. 92–583 (16 U.S.C. 1451 et seq.)), the Wilderness Act (Pub. L. 88–577 (16 U.S.C. 1131 et seq.)), the Federal Land Policy and Management Act (Pub. L. 94–579 (43 U.S.C. 1701 et seq.)), the National Wildlife Refuge System Administration Act (Pub. L. 89–669 (16 U.S.C. 668dd–68ee)), the National Wildlife Refuge System Improvement Act of 1997 (Pub. L. 105–57), National Fish and Wildlife Act of 1956 (Pub. L. 84–1024 (16 U.S.C. 742a, et seq.)), the Fish and Wildlife Coordination Act (Pub. L. 73–121 (16 U.S.C. 661 et seq.)), the Wild Horse and Burro Act (16 U.S.C. 1331 et seq.), an Act of Oct. 30, 2000, Pub. L. 106–398, § 1, 114 Stat. 1654 (enacting into law § 2848 of Part II of Subtitle D of Title XXVIII of Division B of H.R. 5408 (114 Stat. 1654A–426), as introduced on Oct. 6, 2000), the Administrative Procedure Act (5 U.S.C. 551 et seq.), the Otay Mountain Wilderness Act of 1999 (Pub. L. 106–145), Sections 102(29) and 103 of Title I of the California Desert Protection Act (Pub. L. 103–433), the Rivers and Harbors Act of 1899 (33 U.S.C. 403), the Eagle Protection Act (16 U.S.C. 668 et seq.), the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.), the American Indian Religious Freedom Act (42 U.S.C. 1996), and the Religious Freedom Restoration Act (42 U.S.C. 2000bb)." *Id.*

77.  The Calexico Waiver was published in the Federal Register on September 12, 2017.  82 Fed. Reg. 42,829.  Relying on language that mimics the San Diego Waiver, the summary of the Calexico Waiver states that "[t]he Secretary of Homeland Security has determined, pursuant to law, that it is necessary to waive certain laws, regulations and other legal requirements in order to ensure the expeditious construction of barriers and roads in the vicinity of the international land border of the United States near the city of Calexico in the state of California." *Id.*

78.  The Calexico Waiver states that the El Centro Sector, which includes the portion of the border near the City of Calexico, "remains an area of high illegal entry for which there is an immediate need to construct border barriers and roads." The Calexico Waiver further states that "[t]o begin to meet the need for enhanced border infrastructure in the El Centro Sector, DHS will take immediate action to replace existing primary fencing" along a three-mile segment of the border extending westward from the Calexico West Land Port of Entry.

79.  The Calexico Waiver purports to waive "in their entirety, with respect to the construction of roads and physical barriers . . . in the Project Area, the following statutes, including all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of," 27 federal statutes, the majority of which were also included in the San Diego Waiver.

**IV.  THE FENCE REPLACEMENT AND PROTOTYPE CONSTRUCTION PROJECTS DO NOT CONSTITUTE "ADDITIONAL BARRIERS," WILL NOT BE INSTALLED IN "AREAS OF HIGH ILLEGAL ENTRY," AND WILL NOT BE INSTALLED IN AREAS WHERE ADDITIONAL FENCING WOULD BE MOST PRACTICAL OR EFFECTIVE**

80.  The CBP divides the southwest border into nine sectors.  The United States Border Patrol ("USBP"), which is responsible for securing the border between ports of entry, maintains data on the number of deportable migrants apprehended crossing the border (between the ports of entry) in each of the nine sectors.  The apprehension data is regarded as the primary indicator of immigration

1  enforcement and the number of apprehensions is widely understood to correlate

2  with the number of unauthorized entries.

3      81.    President Trump's assertion that there has been a "recent surge of illegal

4  immigration along the southwest border" is inaccurate.  Apprehension data

5  published by the USBP indicates that the number of migrants apprehended by

6  USBP while crossing the southwest border without authorization has fallen sharply

7  since 2000, and particularly since 2006.[1]  In a September 2017 report published by

8  DHS and the Office of Immigration Statistics, DHS admits that the number of

9  southwest border apprehensions in 2016 was 75% lower than it was in 2000.[2]  The

10  report also estimates that there was a 91% reduction in the number of successful

11  illegal entries during that same time period.  *Id*.  According to DHS, "the southwest

12  land border is more difficult to illegally cross today than ever before."  *Id*.  In fact,

13  DHS admits that illegal entries along the southwest border are at their lowest levels

14  "since 2000, and likely since the early 1970s."  *Id*.

15      82.    In particular, from FY 2000 to FY 2016, there have been sharp declines

16  in the number of deportable migrants apprehended by the USBP in the San Diego,

17  El Centro and other sectors.  The San Diego and El Centro sectors are located

18  within California's geographic boundaries and the most western of the CBP's nine

19  border sectors.  The USBP's apprehension data indicates there were 151,681

20  deportable migrants apprehended in the San Diego sector during FY 2000

21  compared with 31,891 apprehended during FY 2016, a reduction of 79%.  In the El

22  Centro sector there were 238,126 deportable migrants apprehended in FY 2000

23  compared with 19,448 in FY 2016, a reduction of nearly 92%.  Of the total number

24  of deportable migrants that were apprehended by the USBP along the southwest

25  _____

26  [1] Official website of the Department of Homeland Security, https://www.cbp.gov/newsroom/media-resources/stats, U.S. Border Patrol Monthly Apprehensions (FY 2000 – FY 2016) (last visited August 25, 2017).

27  [2] https://www.dhs.gov/southwest-border-security (last visited September 18, 2017).

28

border during FY 2016, less than 8% occurred in the San Diego Sector and less than 5% occurred in the El Centro sector.[3]

83.  According to the DHS's website, the San Diego Sector encompasses 56,831 square miles including 931 miles of coastal border from the California border with Mexico north to Oregon.  The San Diego Sector's primary operational area of responsibility consists of 7,000 square miles, including 60 linear miles of international boundary with Mexico and 114 coastal border miles along the Pacific Ocean.  USBP admits that there have been significant declines in the number of undocumented entries in the San Diego Sector over the last three decades.[4]

84.  On April 20, 2017, former Secretary Kelly stated that CBP has observed sharp reductions in the number of unauthorized entries across the southwestern border over the last several months, before the construction of any new border barriers or the replacement of any existing barriers.

85.  The San Diego Waiver describes a "Project Area" that includes an area where multiple layers of primary, secondary and tertiary fencing already exist. During a televised interview on April 20, 2017, former Secretary Kelly admitted that in locations along the border where fencing already exists, that fencing is "very, very effective" and "remarkably effective in keeping down the amount of illegal movement across" the border.

86.  In an infrastructure planning document prepared by CBP relating to the Border Wall Project, dated March 27, 2017, CBP rated its nine sectors along the southwest border according to infrastructure needs within each sector.  CBP admitted that there are no "high priority" areas for the construction of border barriers in California, Arizona, or west Texas.

---

[3] Official website of the Department of Homeland Security, https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/san-diego-sector-california (last visited August 25, 2017).
[4] Official website of the Department of Homeland Security, https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/san-diego-sector-california (last visited August 25, 2017).

87.   The proposed San Diego Project, Calexico Project, and the larger Border Wall Project include the replacement of existing primary and secondary fencing in areas that are neither "areas of high illegal entry," nor areas where additional barriers will be most practical or effective.

88.   There have been no amendments to Section 102 of IIRIRA since the 2008 Amendment was signed into law authorizing any legal waivers for additional construction projects outside those projects specifically authorized and contemplated when it was enacted.  Congressional authority under Section 102 provided for a December 31, 2008 completion date for those specified projects involving construction and reinforcement of fencing.  The proposed Border Wall Project, the San Diego Project and the Calexico Project include the replacement of existing primary and secondary fencing in areas that were not identified as "priority" areas before the 2008 completion date set forth in Section 102 of IIRIRA.

## V.   DEFENDANTS' BORDER WALL PROJECT THREATENS THE STATE OF CALIFORNIA'S ECONOMIC, PROCEDURAL AND SOVEREIGN INTERESTS, AND WILL HARM THE STATE'S NATURAL RESOURCES

89.   California owns real property and is financially responsible for the management of environmentally sensitive lands that are adjacent to the US-Mexico border, including areas where DHS seeks to replace primary and secondary fencing as part of the Border Wall project.  These properties include the 777-acre park known as Border Field State Park, and the Tijuana River National Estuarine Research Reserve which are located in the most southwestern portion of the continental United States and home to more than two dozen endangered and/or specially listed plant and animal species.  These properties are located within California's coastal zone.

90.   California incurs ongoing costs relating to the management and maintenance of Border Field State Park and the Tijuana Reserve.  These include expenses relating to the management of sensitive wetland and upland habitats within the reserve, the upkeep of roads, trails and recreational areas, and the

26

removal of invasive species. California is also financially responsible for removal and disposal of sediment from the "Goat Canyon Sediment Basins," sediment basins that were constructed in Border Field State Park to reduce the impacts of sedimentation from tributaries to the Tijuana River and upland areas along the border.

91.   California will suffer direct injuries to its proprietary interests caused by the proposed Border Wall's negative impacts on biological resources within California's areas of responsibility, increases in invasive species, and/or increased sedimentation.

92.   Further, the Executive Order and the threat of the Border Wall has had and will have a "chilling effect" on California tourism from Mexico. California prides itself on its open and welcoming nature to citizens and non-citizens alike. It is this nature that helps drive the State's strong tourism economy, especially from Mexico, our neighbor to the South. Tourism from Mexico and other countries is a "lead economic driver" of the State. Mexicans made 7.9 million trips to California in 2016 and in total visitors from Mexico spent more than 3 billion dollars in California in 2015.[5] An estimate from the global research firm Tourism Economics estimates Mexican tourism will drop by 7% in 2017, with a continuing downward trend in 2018.[6]

93.   California also has concrete and particularized interests in protecting its natural, recreational, agricultural, historical and cultural resources for the use, enjoyment and benefit of California's residents. *Massachusetts v. EPA*, 549 U.S.

_____

[5] Visitcalifornia.com, http://industry.visitcalifornia.com/media/uploads/files/editor/California%20International%20Visitor%20Volume%20and%20Spend_2015Final_12-6-16.pdf (last visited September 10, 2017); http://industry.visitcalifornia.com/Find-Research/California-Statistics-Trends/ (last visited September 10, 2017).
[6] Los Angeles Times, http://www.latimes.com/world/mexico-americas/la-fg-mexico-us-travel-20170414-story.html

497, 518 (2007); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

94.   The U.S.-Mexico border includes a 140-mile segment that also forms the southern border of California.  Within California, the border extends west from the Colorado River at the State's southeastern corner, across the low-lying Colorado/Sonoran Desert and farmland in the Imperial Valley, over the rugged Otay Mountains, and all the way to the sands of Imperial Beach and the Pacific Ocean.  These regions are home to several endangered and/or specially listed plant and animal species.

95.   Pursuant to the public trust doctrine and other state laws, California has a duty to protect and preserve these natural and biological resources within its boundaries.

96.   Construction of the Border Wall will negatively impact sensitive biological habitats near the border as well as endangered and/or specially listed plant and animal species.

97.   Construction of the Border Wall will involve the use of heavy machinery, trucks and other equipment that will emit greenhouse gases.  These emissions will not be quantified or analyzed with respect to their impact on climate change.  Additionally, potential alternative border security projects will not be considered and mitigation measures will not be addressed pursuant to the normal NEPA review process.  The Border Wall construction will also involve the discharge of pollutants through storm water runoff and the discharge of waste water from the project to state lands and state waters.  The Border Wall construction and the Border Wall itself will therefore have significant negative impacts on California lands, air and water.

98.   California will suffer direct injuries to its proprietary interests caused by the proposed Border Wall's negative impacts on biological resources within California's areas of responsibility, increases in invasive species, and/or increased

1    sedimentation resulting from and/or caused by construction of the Border Wall.

2        99.   The areas along California's southern border contain recreational,

3    historical, and cultural resources enjoyed by California's residents and visitors to

4    California.  These resources include, but are not limited to beaches, hiking and

5    mountain-bike trails, off-road vehicle recreational areas, historical monuments

6    marking the Treaty of Guadalupe and cultural gathering places such as Friendship

7    Park. These resources attract visitors to California and help to stimulate California's

8    economy.

9        100. The proposed Border Wall project will negatively impact the ability of

10   California residents and visitors to obtain access to and enjoy these recreational,

11   historical and cultural resources.

12       101. DHS has injured and continues to injure California by failing to disclose

13   and consider the direct, indirect, and cumulative environmental effects that the

14   Border Wall project will have on the resources of California.

15       102. In addition, California suffered and continues to suffer an injury to its

16   procedural rights under the deliberation-forcing requirements of NEPA, which

17   mandates that DHS evaluate various alternatives, the direct and indirect impacts

18   that each alternative will have on the surrounding environment, and the means by

19   which those impacts may be mitigated.  California also suffered and continues to

20   suffer an injury to its procedural rights under the consistency requirements of the

21   CZMA.  California's procedural rights in this regard are related to the protection of

22   the concrete and particularized interests within its territory, as alleged above.

23   *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178-1179 (9th Cir. 2011).

24       103. Defendants' reliance on Section 102 of IIRIRA as authority for

25   construction of a Border Wall and issuance of a purported waiver of state laws

26   infringes upon California's sovereign right "to create and enforce a legal code, both

27   civil and criminal." *Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982);

28   *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011).

# FIRST CLAIM FOR RELIEF

(For Declaratory and Injunctive Relief Against Each Defendant Based on Defendants' Failure to Comply with NEPA and the APA)

104.  Plaintiffs hereby reallege and incorporate each and every paragraph above.

105. NEPA compels federal agencies to evaluate and consider the direct, indirect and cumulative effects that a proposed development project or program will have on the environment by requiring the agency to prepare an environmental impact statement (EIS) that analyzes a reasonable range of alternatives and compares each alternative's environmental impacts. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, l508.27(b)(7).  The EIS must also include an analysis of the affected areas and resources and the environmental consequences of the proposed action and the alternatives.  40 C.F.R. §§ 1502.10 - 1502.19.

106. The preparation of an EIS not only forces the federal agency to consider these impacts on the environment but it also guarantees that the relevant information will be made public so that interested parties may play a role in both the decision making process and the implantation of that decision.  *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332 (2)(C).

107. The agency must commence preparation of the EIS "as close as possible to the time that the agency is developing or is presented with a proposal" so that the environmental effects of each alternative can be evaluated in a meaningful way.  40 C.F.R. § 1502.23.

108. Defendants are in violation of NEPA because they failed to prepare an EIS concerning a construction project that will span hundreds of miles in four states and in areas that either contain or are adjacent to environmentally sensitive natural resources.

109. California has concrete and particularized interests in the protection of its

30

own proprietary interests near the border as well as the protection of natural, historical, cultural, economic and recreational resources within its jurisdictional boundaries.  Defendants' failure to comply with NEPA injures and denies California's procedural rights necessary to protect these interests.

110. The People seek a judicial declaration that Defendants violated NEPA and further seeks an order enjoining DHS, requiring it to comply with NEPA before taking any further action related to the construction of the Border Wall project, including but not limited to the replacement of existing fences, the building of any prototypes, and the grading and widening of dirt roads.

## SECOND CLAIM FOR RELIEF

(For Declaratory Relief and Injunctive Relief as to Each Defendant Based on Defendants' Failure to Comply with the CZMA and the APA)

111. Plaintiffs hereby reallege and incorporate each and every paragraph above.

112. The western portions of the San Diego Project fall within the coastal zone and, pursuant to the CZMA, California Coastal Act and the CCMP, are subject to the jurisdiction of the Commission.

113. The San Diego Project will affect, directly and indirectly, land and water uses within the coastal zone.  The San Diego Project will also affect, directly and indirectly, natural resources within the coastal zone.

114.  Under the CZMA, California Coastal Act and the CCMP, DHS is required to provide the Commission with a consistency determination demonstrating that their proposed Border Wall/fence replacement project will be undertaken in a manner that is consistent to the maximum extent practicable with the CCMP.

115. The failure of DHS to submit a timely consistency determination violates the CZMA, the California Coastal Act and the CCMP.

116. DHS' conduct caused and will continue to cause an injury to Plaintiffs'

procedural rights under the CZMA.

117. Plaintiffs seek a judicial declaration that DHS violated the CZMA and for an order enjoining DHS from taking any further action relating to the construction of the Border Wall/fence replacement project until it complies the requirements of the CZMA.

## THIRD CLAIM FOR RELIEF

(For Declaratory Relief Against Each Defendant on the Grounds that the San Diego Project, Calexico Project and Larger Border Wall Project Are Not Authorized by Section 102 of IIRIRA (Ultra Vires Violations))

118. Plaintiffs hereby reallege and incorporate each and every paragraph above.

119. The Executive Order and the San Diego and Calexico Waivers cite Section 102 of IIRIRA as authority for construction of the Border Wall and the San Diego and Calexico Projects.  8 U.S.C. § 1103 note.

120. Section 102 of IIRIRA requires the Secretary of Homeland Security to take actions to install specified miles of "additional barriers and roads" or "additional fencing" along United States' southwest border.  The 2008 Amendment to Section 102 of IIRIRA reflects both Congress' recognition that fences already existed along portions of the border and its intent to better secure the border by installing additional fencing in areas where none existed at the time.  8 U.S.C. § 1103 note, subdiv. (a).

121. However, Section 102 of IIRIRA does not authorize or direct the Secretary of Homeland Security, or any other person or entity, to replace already existing fencing.

122. In addition, Section 102 of IIRIRA authorizes the Secretary of DHS to take actions as may be necessary "to install additional physical barriers and roads" in "areas of high illegal entry into the United States." 8 U.S.C. § 1103 note, subdiv. (a).

123. The proposed San Diego Project and the proposed Calexico Project are

32

1    not in areas of high illegal entry and, therefore, are not authorized by Section 102 of

2    IIRIRA.  In fact, multiple layers of fencing already exist in the San Diego Project

3    area and DHS has given no facts to suggest that rebuilding an existing fence will

4    further secure the border, especially as compared to areas without any fencing.

5    DHS has admitted the existing fences are effective in reducing unlawful entries into

6    the United States, and specifically within the San Diego Project area.

7        124. Additionally, the proposed San Diego Project and proposed Calexico

8    Project are not located in areas where the fencing would be most practical and

9    effective.  DHS has made no findings that rebuilding an existing fence in the San

10   Diego area will reduce the number of illegal entries in the area.  Further, DHS

11   admits that the most practical and effective areas to build fencing to further secure

12   the border, would be in areas where no fence exists and where the fence would have

13   a deterrent effect.  The DHS has made no such findings here and, therefore, the

14   replacement of existing fencing and construction of prototypes are not authorized

15   by Section 102 of IIRIRA.

16       125. Further, the larger proposed Border Wall Project, as reflected in the

17   Executive Order, is not authorized by Section 102 of IIRIRA because it fails to

18   distinguish between different areas of the border and whether a particular area is an

19   area of high illegal entry into the United States.

20       126. Section 102 also does not authorize the construction of prototype barriers

21   that are to be used for the purpose of planning and not for the purpose of preventing

22   illegal entries. The prototypes fall outside the "additional physical barriers"

23   contemplated by Section 102 of IIRIRA.

24       127. Plaintiffs seek a judicial declaration that Defendants' Border Wall

25   Project, which includes but is not limited to the construction of prototypes in San

26   Diego County, the construction of the San Diego Project and the Calexico Project,

27   the replacement of existing fences with alternative fencing, barriers, and/or walls,

28   the installation of barriers in areas that are not areas of high illegal entry, as well as

the construction of over 1,000 miles of new barriers along the southern border that were not identified or constructed prior to the deadline specified in the statute, are not authorized under Section 102 of IIRIRA.

### FOURTH CLAIM FOR RELIEF

(For Declaratory Relief Against Each Defendant on the Grounds that the Secretary's Waiver Authority Expired on December 31, 2008 (Ultra Vires Violations Relating to The Waiver Provision))

128. Plaintiffs hereby reallege and incorporate each and every paragraph above.

129. Section 102 required the DHS Secretary to construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective.

130. Section 102 also required the DHS Secretary to identify the 370 miles or other mileage as determined by the Secretary of "priority areas . . .where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States," and to complete the construction of fencing in those priority areas, by not later than December 31, 2008.  8 U.S.C. § 1103 note, subdiv. (b)(1)(B).

131. DHS identified "priority areas" pursuant to Section 102 before the December 31, 2008 deadline and completed its construction of barriers in those areas shortly after the deadline.  Currently, there are 702 miles of border primary, secondary, and tertiary fencing along the border.  Thus, DHS satisfied the mileage requirements set by Congress and it did so within, or shortly after, the time frame set by Congress.

132. DHS did not include the project areas described in the San Diego or Calexico Waivers as part of its obligation to identify and construct necessary barriers in Priority Areas prior to the December 31, 2008, deadline.

133. The authority of the Secretary to identify "priority areas" for construction and to expedite the construction of barriers or roads in these areas under Section

102 expired on December 31, 2008.

134. Plaintiffs seek a judicial declaration that Defendants' authority to expedite the construction of barriers and roads through the use of Section 102's waiver provision expired on December 31, 2008, and, that the San Diego Waiver and the Calexico Waiver are ineffective and invalid.

## FIFTH CLAIM FOR RELIEF

(For Declaratory Relief Against Each Defendant on the Grounds that the San Diego and Calexico Waivers Are Invalid Because Each Waiver Fails to Satisfy the Requirements of Section 102 of IIRIRA)

135. Plaintiffs hereby reallege and incorporate each and every paragraph above.

136. In order to exercise the waiver authority expressed at subsection (c) of Section 102 of IIRIRA, the Secretary of DHS must satisfy the prerequisites for expedited construction as set forth in the other provisions of Section 102.

137. Here, the San Diego Waiver is invalid because former Secretary Kelly failed to present findings and cannot support findings sufficient to establish that the fence replacement and the prototype construction projects described in the waiver constitute "additional" barriers for the purpose of deterring illegal crossings, as required by subdivision (a) of Section 102 of IIRIRA. Similarly, the Calexico Waiver is invalid because Acting Secretary Duke failed to present findings and cannot support findings sufficient to establish that the fence replacement project described in the waiver constitutes "additional" barriers for the purpose of deterring illegal crossings, as required by subdivision (a) of Section 102 of IIRIRA.

138. The San Diego and Calexico Waivers are also invalid because former Secretary Kelly and Acting Secretary Duke failed to present findings and cannot support findings sufficient to establish that the San Diego Project and Calexico Project are being constructed in areas of "high illegal entry," as required by subdivision (a) of Section 102 of IIRIRA. While the San Diego Waiver states that the San Diego sector is one of the busiest in the nation and refers to the number of

35

apprehensions and drug arrests in the sector as a whole, reports published by DHS, USBP and statements made by former Secretary Kelly, establish that the 15-mile sector described in the San Diego Waiver is not an area of high illegal entry. Similarly, reports published by DHS and the USBP indicate that the number of apprehensions in the El Centro Sector is low when compared to other border patrol sectors.

139. The San Diego and Calexico Waivers are also invalid because former Secretary Kelly and Acting Secretary Duke, respectively, failed to present findings and cannot support findings sufficient to establish that the project areas are located in areas where the additional barriers will be the "most practical and effective," as required by subdivision (b) of Section 102 of IIRIRA.

140. Further, the San Diego Waiver is invalid because former Secretary Kelly failed to describe the "various border infrastructure projects" that DHS intends to install in the Project Area.  In other words, DHS seeks to waive federal, state and local laws for projects that it fails to describe and that it may seek to construct at some time in the future, without any time limitation.  As a result, Defendants are denying Plaintiffs and other parties with a reasonable opportunity to assess whether said undisclosed projects, that may be included within the San Diego Project area, comply with the prerequisites of the statute and whether the projects will impact their interests within the time frame established by subdivision (c) of Section 102 of IIRIRA.

141. The San Diego and Calexico Waivers are also invalid because Defendants seek to waive federal, state, and local laws for the continued and indefinite "upkeep of physical barriers, roads, supporting elements, drainage, erosion controls and safety features. . ."  The San Diego and Calexico Waivers lack any definition or time limitations with respect to any of these terms.  As a result, Defendants cannot satisfy their burden of establishing the waivers are needed for the expedited construction of barriers or roads, or that, at the time the upkeep

eventually occurs, the infrastructure is located in an area of high illegal entry.

142. The San Diego and Calexico Waivers are also invalid because the project areas described in each waiver were not identified as "priority areas," and the projects were not constructed before December 31, 2008, the deadline to designate and construct fencing in priority areas.

143. Plaintiffs seek a judicial declaration that the waiver of laws articulated in the San Diego Waiver and the Calexico Waiver is ineffective and invalid.

## SIXTH CLAIM FOR RELIEF

(The San Diego Waiver Violates Article III of the United States Constitution and the Due Process Clause of the Fifth Amendment)

144. Plaintiffs hereby reallege and incorporate each and every paragraph above.

145. Article III of the United States Constitution safeguards both the powers of the judicial branch and litigants' rights to have their claims decided by a judiciary that is independent of pressures from the legislative and executive branches. *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 848 (1986). Article III also ensures the federal judiciary is empowered to resolve claims brought by the states and controversies in which the United States is a party. (Article III, Sec. 2.)

146. The Due Process Clause of the Fifth Amendment and principles of fundamental fairness further guarantee that judicial proceedings will be conducted in a manner that ensures parties reasonable notice of matters impacting their interests and a meaningful opportunity to present grievances or defenses under the procedures prescribed by law. *Turner v. Rogers*, 564 U.S. 431, 444-445 (2011); see also, *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

147. Subdivision (c) of Section 102 of IIRIRA provides that the district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action or decision made by the Secretary of DHS pursuant to the

waiver provision.  Subdivision (c) further provides that any such cause or claim shall be filed within 60 days of the Secretary's decision under the waiver provision. Under this process, the Secretary's publication of the waiver in the Federal Register is intended to place potential litigants on notice of the need to sue.

148. The Attorney General is the chief law officer of the State of California, who by the California Constitution has the authority to file civil actions in order to protect the People's rights and interests, the environment, and the natural resources of this state.  Cal. Const., art V, § 13, Cal. Gov. Code §§ 12600-12612, 12511-12512.  The People have jurisdictional, procedural, economic, and sovereign interests that are being impacted, and will continue to be impacted, by the San Diego Waiver and San Diego Project.

149. The Commission is a state agency designated as the agency responsible for implementing the CZMA within California's coastal zone and developing state programs designed to meet the goals of the CZMA. *American Petroleum Institute v. Knecht*, 609 F.2d 1306 (9th Cir. 1979); Cal. Pub. Res. Code §§ 30008, 30330.  The San Diego Project is planned to take place, in part, within the coastal zone.  Thus, the Commission has jurisdictional and procedural interests that are being impacted, and will continue to be impacted, by the San Diego Waiver and the San Diego Project.

150. Plaintiffs have a right to sue under subdivision (c) of Section 102 of IIRIRA and are entitled a judicial process that is fundamentally fair, which includes reasonable notice of the projects for which federal and state laws are being waived and a meaningful opportunity concerning whether those projects are authorized by Section 102 of IIRIRA.

151. The San Diego Waiver states that DHS intends to install "various border infrastructure projects" within the "Project Area," a 15-mile segment of the border. While the San Diego Waiver identifies two examples of infrastructure projects, specifically the replacement of primary fencing and the construction of temporary

barrier prototypes, DHS' waiver is not limited to those examples.  DHS seeks to waive the application of more than 30 federal laws, as well as county and state laws, in order to expedite the construction of "various border infrastructure projects" without providing any description of all the projects DHS intends to construct.  The waiver fails to provide reasonable notice of the projects that DHS intends to construct.

152. The San Diego Waiver also fails to provide reasonable notice of when any of these undisclosed projects will be constructed.  While the San Diego Waiver includes the statement that the various projects will be "immediately implemented," DHS and Trump Administration officials have admitted that DHS does not have sufficient funding in its current budget to construct all of the projects that it wants to build, including the replacement of secondary fencing.  The funding of this secondary fencing and other undisclosed projects is dependent on the availability of funding in future budgets.  Thus, DHS is attempting to apply Section 102's expedited construction provision to projects that it cannot construct in an expeditious manner, if ever.

153. The San Diego Waiver also fails to provide reasonable notice of where the undisclosed infrastructure projects will be built.  For example, although the San Diego Waiver describes a 15-mile segment of the border as the "Project Area," the San Diego Waiver fails to state how far the project area will extend in a northerly direction or where the undisclosed projects will be placed in relation to real property owned by the State of California.  The San Diego Waiver also leaves open the possibility that DHS may, in the future, condemn property for the purpose of constructing projects that are currently undisclosed.

154. The San Diego Waiver also attempts to waive laws for the continued "upkeep of physical barriers, roads, supporting elements, drainage, erosion controls and safety features . . ."  The San Diego Waiver lacks any definition or time limitations with respect to any of these terms.  By applying the waiver provision to

1  the continued and indefinite "upkeep" of undefined "supporting elements" and

2  "safety features," the Secretary is attempting to extend his waiver authority to

3  matters beyond the expedited construction of border barriers and roads.

4      155. The vague and indefinite nature of the San Diego Waiver renders

5  Plaintiffs' purported right to sue under subdivision (c) of Section 102 of IIRIRA an

6  illusory right that fails to satisfy the basic requirements of fundamental fairness. As

7  a direct result of the failure to describe the "various border infrastructure projects"

8  that will be covered by the waiver or where and when, with specificity, they will be

9  constructed, Defendants are denying Plaintiffs and others a reasonable notice and a

10  meaningful opportunity to formulate and prepare a claim with respect to

11  undisclosed projects within the 60-day limitations period set forth in subdivision (c)

12  of Section 102 of IIRIRA with respect to each undisclosed project.

13      156. Defendants' conduct violates Plaintiffs' due process rights and Plaintiffs'

14  rights under Article III of the United States Constitution.

15      157. Further, as a direct result of the failure to describe the "various border

16  infrastructure projects" that will be covered by the waiver or where and when, with

17  specificity, they will be constructed, Defendants are also interfering with the United

18  States District Court's ability to exercise its authority under Article III of the

19  Constitution of the United States.  The San Diego Waiver is so vague, ambiguous

20  and overly broad with respect to the undisclosed projects that DHS intends to build

21  and the continued upkeep of undefined project features, that it has the effect of

22  denying the District Court an opportunity to assess whether each individual project

23  satisfies the prerequisites for construction under Section 102 of IIRIRA, and

24  comports with the United States Constitution.

25      158. Plaintiffs seek a judicial declaration that the San Diego Waiver violates

26  Article III of the U.S. Constitution, the fundamental fairness doctrine at the heart of

27  the judicial process, and the Due Process Clause of the Fifth Amendment.

28

Complaint for Declaratory and Injunctive Relief

## SEVENTH CLAIM FOR RELIEF

(Violation of the Separation of Powers Doctrine)

159. Plaintiffs hereby reallege and incorporate each and every paragraph above.

160. The Framers of the Constitution have determined that "within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. U.S.*, 488 U.S. 361, 380-384, 109 S.Ct. 64 (1989).

161. As part of this fundamental doctrine, the Supreme Court "has invalidated attempts by Congress to exercise the responsibilities of other Branches or to reassign powers vested by the Constitution in either the Judicial Branch or the Executive Branch." *Id.* For example, in *Clinton v. New York*, 524 U.S. 417 (1998), the Supreme Court overturned an act of Congress, ruling that Congress may not vest its own legislative powers in the Executive Branch, even if Congress intended such a result.

162. Section 102(c) vests unilateral power in the Secretary of the Department of Homeland Security to waive the application of any law in areas along the southwest border if he or she deems it necessary to expeditiously build a border barrier. For example, Section 102 empowers the Secretary with discretion to nullify the application of laws that are intended to protect the environment, prevent unlawful discrimination, promote workplace safety and prevent corruption in the award of government contracts. Under Section 102, the Secretary is authorized to decide which laws to obey or disregard in planning and construction of infrastructure projects along the southwest border without any advanced designation of those particular laws by Congress.

163. Through this Act, Congress has vested its own legislative powers in the Executive Branch in violation of the Separation of Powers doctrine of the U.S. Constitution.

164. The statute as written is facially invalid. This claim is asserted against Defendant United States of America without regard to any action undertaken or decision made by the Secretary of Homeland Security to invoke the unconstitutional waiver provision.

165. In addition, the San Diego and Calexico Waivers violate the separation of powers doctrine as applied in this case, because Congress has vested its own legislative powers in the Executive Branch in violation of the Separation of Powers doctrine of the U.S. Constitution to allow the waiver of more than 30 federal laws by the Executive Branch. Congress must designate in advance each law it is waiving through its legislation, and can then, and only then, provide the Executive Branch discretion to waive those laws as it sees fit, thus implementing a legislative action.

166. Further, the San Diego and Calexico Waivers violate the separation of powers doctrine as applied in this case because Defendants are relying on the waiver provision to divest Congress of its legislative powers 10 years after Congress imposed a deadline to identify and expedite the construction of border barriers in priority areas. The waiver provision is being applied in a manner that divests Congress of its legislative powers, with respect to application of laws in the border region, in perpetuity.

167. Finally, the San Diego and Calexico Waivers violate the separation of powers doctrine as applied in this case because they provide for the vague and indefinite, and potentially never-ending, divestment of legislative powers in violation of the Separation of Powers Doctrine. For example, the San Diego Waiver does not disclose all of the "various border infrastructure projects" to which the waiver is being applied nor does it disclose when those undisclosed projects will be constructed. The San Diego and Calexico Waivers also attempt to waive laws for the continued "upkeep of physical barriers, roads, supporting elements, drainage, erosion controls and safety features. . ." but lack any definition or time

42

1  limitations with respect to these terms.  By failing to describe the various projects

2  that DHS may build within a 15-mile project area, and by applying the waiver

3  provision to the continued and indefinite "upkeep" of undefined "supporting

4  elements" and "safety features," Defendants are attempting to extend the waiver

5  authority to matters beyond the expedited construction of border barriers and roads.

6  Defendants are applying Section 102's waiver provision in a manner that divests

7  Congress of its legislative powers along a 15-mile and 3-mile segments of the

8  border indefinitely.

9      168. Plaintiffs seek a judicial declaration that Section 102 of IIRIRA violates

10  the Separation of Powers doctrine of the U.S. Constitution because it improperly

11  vests legislative power in the Executive Branch.

## EIGHTH CLAIM FOR RELIEF

(Violation of Article I, Section 1 of the United States Constitution)

14      169. Plaintiffs hereby reallege and incorporate each and every paragraph

15  above.

16      170. Article 1, Section 1 of the U.S. Constitution provides that "[a]ll

17  legislative powers herein granted shall be vested in a Congress of the United

18  States . . ."

19      171. This clause of the Constitution has been interpreted to mean that all

20  lawmaking functions have been vested in the Congress and cannot be delegated to

21  another branch.  *Loving v. U.S.*, 517 U.S. 748, 758 (1996).

22      172. Section 102(c) delegates to the Executive Branch, namely the Secretary

23  of the Department of Homeland Security, the power to waive the application of any

24  act of Congress along the entire southwest border.  The only guidance Congress

25  provided to the Executive Branch was to say that the waiver should be exercised as

26  the Secretary "determines necessary to ensure expeditious construction of the

27  barriers and roads under this section."  Section 102(c) provides no other guidance

28  concerning which particular laws should be waived and which laws should be

followed. Though the words "necessary" and "expeditious" may have held meaning when enacted in 2008, they no longer do in light of the time elapsed since their passage.  Additionally, the 2008 Amendment imposed a deadline on DHS to identify "priority areas" and expedite the construction of additional barriers in those areas by not later than December 31, 2008. In light of these provisions and the passage of time, the purpose of the waiver provision cannot be said to continue to reflect Congressional intent nine years later.

173.  Thus, Section 102(c) permits the Secretary to make legislative decisions without an intelligible principle to guide it.  This Act therefore violates Article I, Section 1 of the U.S. Constitution and the non-delegation doctrine.

174.  Additionally, Congress retained no checks on the actions of the Executive Branch pursuant to Section 102(c), and removed any opportunity for judicial review outside of Constitutional issues.  This lack of meaningful reviewability renders the delegation improper.  *Amalgamated Meat Cutters and Butcher Workmen of North Am. v. Connally*, 337 F. Supp. 737, 759 (D.D.C. 1971).

175. The statute as written is therefore facially invalid.  This claim is asserted against Defendant United States of America without regard to any action undertaken or decision made by the Secretary of Homeland Security to invoke the unconstitutional waiver provision.

176. Section 102(c) is also invalid as applied in this case, because, for the reasons stated above, Congress cannot properly delegate to the Executive Branch the ability to waive any and all federal laws with no meaningful opportunity for review of that waiver.  Thus, the former Secretary's waiver of more than 30 federal laws and the acting Secretary's wavier of 27 federal laws violate Article I, Section 1 of the U.S. Constitution.

177. Further, the San Diego and Calexico Waivers violate the non-delegation doctrine because Defendants are relying on the waiver provision to divest Congress of its legislative powers 10 years after Congress imposed a deadline to identify and

44

expedite the construction of border barriers in priority areas.  The waiver provision is being applied in a manner that divests Congress of its legislative powers, with respect to application of laws in the border region, in perpetuity.  Congress did not delegate its functions with respect to application and/or waiver of laws to the Secretary of Homeland Security in perpetuity.

178. Finally, the San Diego and Calexico Waivers violate the non-delegation doctrine as applied in this case because the waiver provision is being applied in a manner that extends the purported delegation of legislative authority, within the described project areas, indefinitely.  For example, the San Diego Waiver does not disclose all of the "various border infrastructure projects" to which the Waiver is being applied nor does it disclose when those undisclosed projects will be constructed.  The San Diego and Calexico Waivers also attempt to waive laws for the continued "upkeep of physical barriers, roads, supporting elements, drainage, erosion controls and safety features. . ."  The San Diego and Calexico Waivers lack any definition or time limitations with respect to any of these terms.  By failing to describe the various projects and applying the waiver provision to continued and indefinite "upkeep" of undefined "supporting elements" and "safety features," Defendants are attempting to extend the waiver authority to matters beyond the expedited construction of border barriers and roads.  Congress did not delegate its functions with respect to the application and/or waiver of laws to the Secretary of Homeland Security without regard to the nature of the border infrastructure project or whether it would be constructed in an expedited fashion.

179. Plaintiffs seek a judicial declaration that Section 102 of IIRIRA violates Article 1, Section 1 of the U.S. Constitution and is an improper delegation of legislative power to the Executive Branch.

## NINTH CLAIM FOR RELIEF

(Violation of Article I, Section 3 of the United States Constitution)

180. Plaintiffs hereby reallege and incorporate each and every paragraph above.

181. Article I, Section 3 of the U.S. Constitution provides that "[j]udgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."

182. The Supreme Court has interpreted Article I, Section 3 to mean there is no immunity provided by the U.S. Constitution to criminal laws or criminal prosecution and that no person is above the law. *O'Shea v. Littleton*, 414 U.S. 488, 503-504, 94 S.Ct. 669 (1974); *Dennis v. Sparks*, 449 U.S. 24, 31-32, 101 S.Ct. 183 (1980); *U.S. v. Lee*, (1882) 106 U.S. 196, 220, 1 S.Ct. 240 (1882).

183. Absent a clear immunity or waiver from a criminal law enacted by Congress and signed by the President, the Executive Branch cannot violate or nullify a criminal law.

184. Section 102(c) vests unilateral power in the Secretary of the Department of Homeland Security to waive the application of any laws that he or she determines is necessary to expeditiously build a border wall, including any criminal laws, such as bribery, racketeering and other anti-corruption laws without a clear, specific waiver of these statutes by an act of Congress that is signed by the President.

185. This power to waive any criminal law to expeditiously build the Border Wall, in the absence of an act of Congress that authorizes the waiver of those criminal laws specifically, violates Article I, Section 3 of the U.S. Constitution.

186. The statute as written is therefore facially invalid. This claim is asserted against Defendant United States of America without regard to any action

46

undertaken or decision made by the Secretary of Homeland Security to invoke the unconstitutional waiver provision.

187. Further, the San Diego and Calexico Waivers waive criminal laws, including those under the federal Resource Conservation and Recovery Act (42 U.S.C. § 6921), the federal Clean Water Act (33 U.S.C. § 1311) and the Endangered Species Act (15 U.S.C. § 1540). The former Secretary and Acting Secretary have therefore waived criminal laws for the illegal disposal of hazardous waste on land or in our nation's waters as well as criminal laws concerning the taking of endangered species. The waivers do not even provide the public with information concerning which parts of the specified criminal laws may be disregarded and why.

188. The statute is invalid as applied in this case because Congress did not explicitly authorize the waiver of criminal laws described in the San Diego or Calexico Waivers, nor did it immunize specific acts from criminal prosecution.

189. Plaintiffs seek a judicial declaration that Section 102 of IIRIRA violates Article I, Section 3 of the U.S. Constitution because it improperly allows the Executive Branch to violate or nullify criminal laws, including criminal hazardous waste laws.

**TENTH CLAIM FOR RELIEF**

(Violation of Article I, Section 7 of the United States Constitution)

190. Plaintiffs hereby reallege and incorporate each and every paragraph above.

191. Article I, Section 7 of the U.S. Constitution provides that "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; if he approves he shall sign it, but if not he shall return it."

192. The Supreme Court has stated that this means that the Executive Branch cannot void any law without Congress passing a law voiding the previous law and

47

presenting it to the President for signature. *Clinton v. City of New York*, 524 U.S. 417 (1998).

193. Section 102(c) vests unilateral power in the Secretary of the Department of Homeland Security to waive the application of any laws in areas along the border for purposes of building the Border Wall without Congress passing a law to void the specific laws at issue or limit their application, and presenting it to the President in violation of Article I, Section 7 of the U.S. Constitution.

194. The statute as written is therefore facially invalid. This claim is asserted against Defendant United States of America without regard to any action undertaken or decision made by the Secretary of Homeland Security to invoke the unconstitutional waiver provision.

195. The statute is also invalid as applied in this case. Here, former Secretary Kelly unilaterally decided to waive more than 30 federal laws, and Acting Secretary Duke unilaterally decided to waive 27 federal laws. In so doing, each unilaterally chose which laws to waive and which laws to obey, without an act of Congress specifying which particular law or set of laws could be waived and without the presentation of said Congressional act to the President.

196. Plaintiffs seek a judicial declaration that Section 102 of IIRIRA violates Article I, Section 7 of the U.S. Constitution because it allows the Executive Branch to nullify the application of an act of Congress without Congress passing a law and presenting it to the President.

## ELEVENTH CLAIM FOR RELIEF

(Violation of the Tenth Amendment of the United States Constitution)

197. Plaintiffs hereby reallege and incorporate each and every paragraph above.

198. The Tenth Amendment to the United States Constitution provides, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

48

199. States, therefore, have "the power to create and enforce a legal code, both civil and criminal." *Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982); *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011). Congress may not infringe on the State of California's sovereign authority to enforce its own laws. "[W]hen a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code' [ ] it inflict[s] on the state the requisite injury-in-fact." *Cty. of Santa Clara v. Trump*, No. 17-CV-00485-WHO, 2017 WL 1459081, at *17 (N.D. Cal. Apr. 25, 2017), reconsideration denied, No. 17-CV-00485-WHO, 2017 WL 3086064 (N.D. Cal. July 20, 2017), quoting *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985).

200. On its face, Section 102(c) vests the Secretary of the Department of Homeland Security with the power to waive "all legal requirements" in order to expeditiously build the border wall. If this phrase is interpreted to allow the Secretary to waive the application of state and local laws, it would include the power to waive state laws that are intended to ensure work-place safety, anti-harassment and discrimination laws, state wage and hour laws, anti-corruption laws, laws relating to public safety, or any other state law, including criminal enforcement provisions of state law.

201. Although Congress may preempt state and local laws in a particular legislative field, Congress does not have the power to simply waive all state and local laws and vest in the Executive Branch the power to waive all such laws.

202. Section 102(c), by creating such authority and vesting it in the Secretary of the Department of Homeland Security, violates the Tenth Amendment of the U.S. Constitution.

203. The statute as written is therefore facially invalid and this claim is asserted against Defendant United States of America without regard to any action undertaken or decision made by the Secretary of Homeland Security to invoke the unconstitutional waiver provision.

204. The statute is also invalid as applied in this matter. In their attempts to exercise Section 102's waiver provision, former Secretary Kelly and Acting Secretary Duke issued waivers that purport to waive federal laws and numerous California laws that are related to the same subjects, including Porter-Cologne Water Quality Control Act (Cal. Water Code, §§ 13000, et seq.), California Endangered Species Act (Cal. Fish & Game Code, §§ 2050-2115.5), California State Historical Resources Act (Cal. Pub. Res. Code, §§ 5020-5029), California Coastal Act (Cal. Pub. Res. Code, §§ 30000-30900), California Fish and Game Laws (Cal. Fish & Game Code, §§ 1801 and 4181) and California's public nuisance laws (Cal. Gov. Code, §§ 12600 et seq.; Cal. Civ. Code, § 3480; Cal. Pen. Code, § 370.). These state laws do not conflict with any federal law and Congress has not explicitly stated an intent to preempt state laws in these areas.

205. Further, as construed by the Secretaries of DHS, the authority to waive California laws is indefinite in duration and unlimited, subject to the barest of findings that a border crossing is an area of high illegal entry, with no standards or criteria for making this determination. The former Secretary and Acting Secretary have attempted to apply Section 102's waiver provision over nine years after its last amendment in which Congress referenced projects limited to 2008.

206. Additionally, the San Diego Waiver attempts to waive state laws with respect to the construction of "various border infrastructure projects" without defining what those projects will be or when they will be constructed. As noted below, this appears to include projects for which funding is not currently available.

207. The San Diego and Calexico Waivers also attempt to waive state laws for the continued "upkeep of physical barriers, roads, supporting elements, drainage, erosion controls and safety features. . ." The waivers lack any definition or time limitations with respect to any of these terms. By failing to incorporate meaningful definitions, the scope of the intrusion by Defendants into areas of historic state regulation and governance is potentially vast, extending beyond just

1    the expedited construction of border barriers and roads.

2    208. DHS is applying Section 102 in a manner that would grant them an

3    indefinite and open-ended waiver of state laws in violation of the 10th Amendment.

4    209. Plaintiffs seek a judicial declaration that Section 102 of IIRIRA violates

5    the Tenth Amendment of the U.S. Constitution by vesting in the Executive Branch

6    the power to waive state and local laws, including state criminal law.

7                              **PRAYER FOR RELIEF**

8    WHEREFORE, Plaintiffs request the Court to enter a judgment:

9    1.    Declaring that DHS violated NEPA and the APA, and continues to

10   violate NEPA and the APA, by failing to conduct NEPA review prior to engaging

11   in planning and construction activities concerning the Border Wall and the San

12   Diego and Calexico Projects.

13   2.    Declaring that DHS violated the CZMA and the APA, and continues to

14   violate the CZMA and the APA, by failing to provide the Commission with a

15   consistency determination demonstrating that the San Diego Project will be

16   undertaken in a manner that is consistent to the maximum extent practicable with

17   the CCMP.

18   3.    Declaring that Section 102 of IIRIRA does not authorize the replacement

19   of existing fencing or barriers and that the San Diego and Calexico Waivers are

20   therefore inapplicable and invalid with respect to the replacement of existing

21   fencing or barriers.

22   4.    Declaring that Section 102 of IIRIRA does not authorize the replacement

23   of existing fencing or the construction of new barriers areas within the project areas

24   described in the San Diego and Calexico Waivers because the project areas are not

25   located in areas "of high illegal entry" and that the Waivers are inapplicable and

26   invalid.

27   5.    Declaring that Section 102 of IIRIRA does not authorize the construction

28   of prototype fences, barriers or walls for the purpose of planning and that the San

Diego Waiver is inapplicable and invalid with respect to the prototype construction described in that waiver.

6.    Declaring that the San Diego and Calexico Waivers are ineffective and invalid because the authority to waive laws under Section 102 of IIRIRA expired on December 31, 2008.

7.    Declaring that the San Diego and Calexico Waivers are ineffective and invalid because the waivers failed to satisfy the requirements of Section 102 of IIRIRA and Defendants cannot meet their burden of making and supporting findings to meet Section 102's requirements.

8.    Declaring that, as applied in this matter with respect to the San Diego Waiver, subsection (c) of Section 102 of the IIRIRA violates Article III of the United States Constitution and the Due Process Clause of the Fifth Amendment.

9.    Declaring that, on its face and as applied in this matter with respect to the Border Wall Project, the San Diego Project and the Calexico Project, subsection (c) of Section 102 of the IIRIRA violates the Separation of Powers doctrine of the United States Constitution.

10.   Declaring that, on its face and as applied in this matter with respect to the Border Wall Project, the San Diego Project, and the Calexico Project, subsection (c) of Section 102 of the IIRIRA violates Article I, Section 1 of the United States Constitution.

11.   Declaring that, on its face and as applied in this matter with respect to the Border Wall Project, the San Diego Project and the Calexico Project, subsection (c) of Section 102 of the IIRIRA violates Article I, Section 3 of the United States Constitution.

12.   Declaring that, on its face and as applied in this matter with respect to the Border Wall Project, the San Diego Project, and the Calexico Project, subsection (c) of Section 102 of the IIRIRA violates Article I, Section 7 of the United States Constitution.

13.   Declaring that, on its face and as applied in this matter with respect to the Border Wall Project, the San Diego Project and the Calexico Project, subsection (c) of Section 102 of the IIRIRA violates Tenth Amendment of the United States Constitution.

14.   Granting injunctive relief to Plaintiffs and enjoining Defendants from undertaking any activities concerning construction of the Border Wall until DHS demonstrates compliance with NEPA and the APA.

15.   Granting injunctive relief to Plaintiffs and enjoining Defendants from undertaking any activities concerning construction of the Border Wall until DHS demonstrates compliance with the CZMA and the APA.

16.   Granting injunctive relief to the Plaintiffs and enjoining the Secretary of DHS from waiving any laws for the purpose of expeditiously building the Trump Administration's Border Wall, the San Diego Project, and the Calexico Project.

17.   Ordering such other relief as the Court deems just and proper.

Dated:  September 20, 2017                    Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
TIMOTHY R. PATTERSON
Supervising Deputy Attorney General


s/Michael P. Cayaban
MICHAEL P. CAYABAN
Supervising Deputy Attorney General
*Attorneys for the People of the State of California, by and through Xavier Becerra, Attorney General, and the California Coastal Commission*

Complaint for Declaratory and Injunctive Relief